Thank you very much. As I said, good morning. May it please the Court, my name is William Gennagel. I represent the defendant appellant Gerard Smith. I want to thank the Court for enlarging the time that we have for argument. In the ten minutes that I intend to take in the beginning, I want to just make several points about the jury instructions, and time permitting, I want to briefly address the Aguilar issue. First of all, if Gerard Smith as a subordinate police officer took the actions alleged in the indictment based on orders of his superiors, and he reasonably believed those orders were lawful, he could not be acting with corrupt intent. His reasonable belief that those orders were lawful negates corrupt intent. And I believe after this Court's decision in Doe, which says a public authority defense can be used to negate an element of the crime, that qualifies as an affirmative defense of public authority. And because unlike Doe, we are negating an element of the crime, the burden should have been on the government to disprove that this was objectively reasonable. And that was our proposed instruction number 23, which is that excerpt to the record 70. That is consistent with an affirmative defense of public authority that is used to negate an element of mens rea. And we cited the cases in our brief that supports that proposition, and there was evidence here that established both that they were acting pursuant to orders, and that it was reasonable for them to believe that these orders were lawful. And that type of instruction is particularly important in the context of subordinate police officers. And the Barker case, of course, talked about that a lot, about even the model penal code said there should be a special exception for police officers because they have an obligation to act, and you need to make sure that they're not impeded in exercising their duty. And so you need to give them the protection of that kind of instruction. So the jury instructions told the jury that to find defendants guilty, they had to have an intent to obstruct the federal grand jury investigation. How, I mean, even with what you're saying, if the jury found that that was defendant's intent, then how is that, I don't understand what the problem is. They could have found that all the things you're saying are true, but if they're also finding that they had the intent to impede a federal, obstruct a federal grand jury investigation, then don't they have the necessary intent to find them guilty? I don't believe so, Judge Friedland, and the reason is because the judge actually gave an affirmatively incorrect instruction. Which one was that? That was the instruction that he modified based on Barker, which is at page 233 and 240 of the excerpts of record, and what happened was that, this is after we finished arguing. We had already given our defense summation on Monday. Tuesday morning, we come in, we wanted the same instruction he had given in the Sexton case, which said that it's inconsistent with unlawful intent. The jury then would have known. It's one or the other. So, if the jury made that finding... Are you arguing now that the problem was the timing or the problem was the substance? The problem was the substance, and I'm just pointing out how unfair it was, but if the jury had been given those two options, if they acted pursuant to objectively lawful orders, they can't have corrupt intent, and they found corrupt intent, you'd be absolutely right. We would have no complaint. That's not what happened. The judge basically said incorrectly in our view. I mean, he thinks that you can have both those states at the same time. But weren't there multiple acts? So, couldn't you have following orders for some act and obstructing justice for another act? You certainly could, but you needed to make it clear to the jury that those two states were inconsistent, even if they're going to focus on a particular act, and one of the breadth and scope of the government's case, which I hope to briefly address in APPLR, but in this context, the jury really needed to know the difference, and then if they found corrupt intent, so be it. They were at least instructed correctly that it's one or the other. That's not what happened, and what the judge did was he said, it's evidence that you can consider. Now, I realize if you look at that, you say, it's just several words. What's the big deal? But these are jury instructions. The judge changed it for a reason. I mean, he just didn't want to make a better sentence. He wanted to make sure the jury understood, well, you can find that they're acting pursuant to what they believe were lawful orders, but they were still acting corruptly, and that's not true. That is, in this context, that is not true, and so you needed that dichotomy, and we didn't get it, and one of the other problems with that was the dual purpose instruction. Granted, you can have dual purposes. You can have an unlawful purpose, and you can have a lawful purpose. You can have a lawful purpose in wanting to protect Brown, right? That doesn't mean you couldn't be doing it unlawfully to obstruct justice, granted, but what you can't have is you can't have someone in this context who is acting pursuant to what they think are lawful orders and also have corrupt intent, and the dual purpose instruction, not unintentionally, made it seem as if you could, and that's what the harm here. These officers needed to be able to have the protection of a jury instruction which said that just because you're doing what you are told, if it seems to be because you've got an obligation to follow orders, as long as it appears to be objectively reasonable, you've got protection. Now, if the government can prove that it was not objectively reasonable, and because it's a public authority defense that negates mens rea, they would have to do that beyond reasonable doubt, they're entitled to an acquittal, and we never got the benefit of that instruction. The other problem that we had here is the court's view and the government's view that once they found out that this was an FBI phone, game's over, and I just think that that's wrong. There's no support for that. They could continue to investigate because they wanted to find out whether or not this was authorized, who authorized it, and certainly... I have trouble understanding your argument on that point because the judge didn't say they couldn't investigate whether the FBI had actually been the ones to give him the phone. The judge didn't say they couldn't investigate a possible crime. I mean, the idea that if they had a phone from the FBI it wasn't a crime doesn't negate the possibility of lots of areas of investigation, does it? Absolutely. I agree with you on that, and I think that what happened, though, was that we had proposed an instruction in the beginning saying that local officers have a right to investigate and they have a right to investigate potential crimes by federal officers, right? So that was the instruction that we were operating with throughout the entire trial. That's what we wanted. That was our defense, the right to investigate. The judge then, and this again after the arguments, he... Well, again, are you arguing about the timing or the substance? I'm arguing about the substance, but I do think that it shows the unfairness of it. And what the judge then did was he gave this instruction saying that if the phone or other contraband was introduced at the direction of the FBI, he didn't even say authorized, at the direction of the FBI, there would be no crime. First of all, I think that that's basically instructing the jury what the facts they should find, but it was also really directed at Craig's testimony and Levin's testimony. The judge wanted to make sure that the jury would not be misled by the testimony. So that's where we get that instruction. If that's what the purpose of the instruction was, the judge should have given the CalGIF instruction on the state offenses, not tell them there was no offense, it was directed by the FBI. And the way that it comes up, Judge Friedland, is because... And we told the judge this when we were complaining about the instruction. If you give that instruction, which says that there's no crime if it was directed, then they can't investigate. I mean, that's... Why not, though? I mean, this is what my question was about. Even the premise of the instruction is that the FBI gave him the phone. Wouldn't they have to investigate that? I mean, maybe he got the phone from someone else. There are lots of things you can still investigate. So I don't understand this argument. The reason I think there's a problem with that is because another instruction said they had the right to investigate potential crimes. And so the judge was saying, there's no crime here. But, so say he got the phone from another inmate, then it is a crime, right? I mean, there are lots of things they could still have been investigating. They still could have been investigating what this guy was doing with the phone, with potentially with drugs you've been arguing. So I just don't really see how this instruction cut off any or most avenues of investigation, even assuming your argument. There was no dispute. Everybody agrees that on August 18th, when the assistant director in charge of the FBI called up Sheriff, former Sheriff Baca and said, that's my phone. Everybody knew that it was inserted by the phone at that point. And if I could just make one point before I get to the end of my time here, if you want to see how it played out and why I think our argument is solid on that ground is, look at the prosecutor's rebuttal. That's the way he interpreted that instruction. And he told the jury in his rebuttal argument, once they find out it's an FBI phone, game over. That's the interpretation of the instruction. And that's what they had back in the jury room. I just want to spend one minute on the Aquilar issue, just very briefly. And that is the following. Everybody agrees that obstruction of an FBI investigation cannot be a violation of 1503. Now, in this case, given the government's arm of the grand jury theory, they're one and the same. And there's a couple of ways around it. The brief, I think, really does a very good job of explaining why the arm of the grand jury theory only goes to the foreseeability element. And that's explained in the briefs, and I don't want to dwell on that here. But what I do want to point out is that if you are going to allow the government to proceed on an arm of the grand jury theory, where basically the FBI becomes the grand jury, you need some protection to make sure that they just don't morph into one another. And what should have been done, at a minimum, is that there should have been an instruction about what the arm of the grand jury is. In essence, the arm of the grand jury became an element of the crime for the government. And we had asked that, exercise of record 37, we said, if you proceed on this basis, you need an instruction on the arm of the grand jury. I see my time has used up, so. Good morning, Your Honors. Todd Burns on behalf of Stephen Levins. My plan is to begin discussing the jury dismissal issue and then time permitting to discuss the issue with respect to the preclusion of the testimony of Paul Yoshinaga, the Chief Legal Advisor to the Los Angeles Sheriff's Department. On the fifth day of jury deliberations, the juror sent out a note saying that due to duress, she was to be excused. The fact that that happened on the fifth day, in the words of this court's opinion in Christensen, is consistent with the juror attempting to engage in deliberations on the merits, but unable to convince her cohorts. The juror said that the duress was not from the other jurors, though, didn't she? Well, she said it wasn't from any specific source. Her answers to those questions were... I thought the court asked, was the duress from other jurors, and she said no. I think she asked if the fear of retaliation was from any other jurors. So, and the answers to all of those questions were sort of vague, but the court switched gears from those questions quite quickly, rather than delving into them, and I don't think that there was anything that prohibited the court from getting more context. But it was obvious what the district court thought the problem was, because he shifted gears quite quickly to saying, you know, in cases like this, there's a fairly long case. Jurors have different opinions. They're going to express their opinions. It's not unusual that voices might get raised from time to time, but it's part of the process. He clearly seemed to understand the thing that is consistent with this situation, which was remarked on in Christensen, which is that they're in there fighting it out. That's, you know, what jurors sometimes do. The movie, after all, is called 12 Angry Men, not, you know, 12 complacent people who are all getting along. And that beginning of the questioning forms the context of everything that comes after that. If that wasn't what was going on, of course, the juror would say, no, that's not the issue. It's not that people's voices are getting raised and stuff like that. It's something else. But she doesn't disagree with that. And furthermore, in the course of the questioning, early on, the judge says, in the first real page of the questioning, he starts putting this qualifier on it. Can you reach a decision? Can you reach a verdict? And she says, no, I can't. And when the judge removes that qualifier, she then repeatedly says, I can deliberate. I can go on. I can fulfill my role as a juror. Given those facts, it's impossible to be firmly convinced that there wasn't a dispute about the merits underlying this request to be excused. And, you know, in footnote five of Symington, the court talks about this firmly convinced standard is like beyond a reasonable doubt. And I don't know how you could possibly say that it's beyond a reasonable doubt that her problem, her reason for asking to be excused, had to do with something other than a dispute on the merits. Now, I think the root of the problem here is that the court, the district court, wasn't aware of Symington, didn't have any briefing on it. As in Christensen, the court had was fully aware of the test and applied the test appropriately. Here, the district court obviously wasn't aware of the test, because the district court clearly seemed to believe, look, if this juror is having a problem, even if that problem is related to a dispute about the merits, if it's affecting her ability to deliberate, I have to excuse her or I just cause to excuse her. And that simply isn't correct. You can't excuse a juror who's engaged in a conflict with other jurors. You can't just excuse a juror without infringing on the defendant's right to a unanimous verdict. Now, I think... I think you get the beyond a reasonable doubt standard. Is that actually in Symington? In footnote five, they compare it to the beyond a reasonable doubt standard. And it says, you know, leads you firmly convinced, which is sometimes language that's used in defining reasonable doubt. I mean, I read it as there needs to be a reasonable possibility that the juror was... that the reason was disagreement with the other jurors. And here, the juror never said that that was the problem. The juror essentially agreed with the judge's characterization that that was the problem. And then when also indicated in the course of questioning, when the qualifier reached a decision and reached a verdict is removed, agreed that she could continue deliberating. And this is an unusual circumstance in that, in most cases, some jurors are accusing another juror of not being willing to deliberate, not being willing to follow law. This juror comes to the judge, expresses her concern. The judge says, I understand your concern. You know, tempers get raised. People have strong opinions. That happens. Well, the judge did say something about how people might raise their voices, but she never... I mean, she gave this kind of incoherent explanation of what her problem was, and apparently was very distressed and emotional. And the judge apparently seems to have reacted to her emotional state almost more than any answer she gave, because her answers are sort of all over the place. Well, I don't think... the judge didn't say at the time, look, let the record reflect, or none of the party... none of the counsel said, let the record reflect she's doing something, you know, extreme emotionally. There is nothing like that at all. There is this vague reference to, oh, she was emotional months later at the hearing on motion for a new trial, but there's nothing extreme that she's crying, that she's breaking down, or anything like that. But even if there were, if that extreme emotional response was due to a disagreement on the merits, she can't be excused. Otherwise, these trials would become, you know, where there's a conflict, would become sort of a contest of maybe who's the most obnoxious, or who has the endurance to withstand this conflict, you know, who's going to give up first. And that certainly can't be the law. Now, I think it's useful to say a couple things on when confronted with this situation, at the point that he excused the juror. He could have declared a mistrial. He could have said, you have to continue deliberating with the other jurors, to juror number five, or he could have asked some more questions. I think it would have been permissible to ask more questions, and could have been done without invading the secrecy of the jury deliberations. The four of the defendants asked for one of those options. Some of them asked for both. I mean, Levins and Long both moved for a mistrial and said the juror shouldn't be excused. Smith asked for, I'm sorry, Levins and Monzo asked for that. Long asked for a mistrial. Smith asked that the juror be asked further questions. Craig didn't, counsel for Craig didn't say anything, but the other counsel effectively preserved the issue for him. The complicator is Thompson, whose counsel says, I agree, when the district court says, I think we should cut her loose. I believe that this isn't a situation in which the district court is sandbagged. The district court was presented with the right positions. It made the erroneous choice. And when you're sort of weighing in the balance here, well, should Thompson get relief based on this constitutional error versus, you know, sort of prejudice to the government, the prejudice to the government of retrying six defendants as compared to five is minimal, whereas, of course, the harm to Thompson is quite significant. Turning to the Yoshinaga preclusion issue, if the court doesn't have any other questions on the juror dismissal issue, I think the important thing to emphasize is that, you know, Bush and Bisno make clear that advice of counsel, conferring with counsel may be relevant to good faith. And they arrived at those holdings in the context where there was a general good faith instruction. Here, there is a theory of defense instruction that says that the defendants believe in good faith that defying lawful orders, and that effectively, that was objectively reasonable. That's not consistent with criminal intent. Yoshinaga's testimony was pertinent to both prongs of that theory of defense instruction. And, you know, what's ironic is that not only was actually permitted, somewhat inconsistently, to testify to some degree about his interactions with the Yoshinaga, but he kept being shut down when he tried to say, well, what did Yoshinaga tell you, and what did you do based on that, based on really meritless foundation objection. Which aspects of the Yoshinaga proffer do you think specifically were not let in through this other testimony? Because when I read the Yoshinaga proffer, it seems pretty vague. It's not obvious to me what specific things he was going to say that you think should have gotten in. I think the key thing is the interactions that Yoshinaga and Levins had with respect to this memorandum that was eventually signed off by Captain Carey, because that memorandum formed the legal basis for going ahead with this investigation. And Levins made quite clear that, look, you know, I wanted to make sure that we had a firm legal foundation for going ahead with this testimony. That interaction that they had both reinforces in Levins' mind that this is, this is, you know, these are lawful orders. It reinforces in the jury's mind that he's going ahead with this in good faith to try and make sure that he's following lawful orders. And it also supports, you know, the objective reasonableness aspect of the instruction. But the irony is that the objections come whenever really almost all of them come when And then, in cross-examination, government counsel tries to make it clear, well, you didn't really meet with him. You made this up. You didn't say this during the grand jury proceedings. You're making this up now, and he drives that point home in closing. You're making this all up. He doesn't have good faith. He didn't confer with Yoshinaga. And that's completely contrary to what Yoshinaga would have said if he had testified. I mean, that's just, it's, he's not only been prejudiced by losing this key witness, he's then made to appear like he's a liar. I mean, so Yoshinaga would have said that they met, that's for sure. But, but it's not clear from Yoshinaga's proffer really what he would have said about what they said when they met. He would have said that they conferred, and he provided legal advice with respect to penal code sections, et cetera, for the memorandum. I mean, some of it was vague, but certainly not with respect to the memorandum. To the extent there was more solid substance to it was in that context. Thank you. Let me ask for your support. I'm Karen Landau. I represent Scott Craig, and I'm going to discuss an issue that pertains to, well, pertains to both the obstruction and the false statement count. The critical issue here was whether the defendants who were, Craig and Long were, of course, members of the ICID, and they were subordinate law enforcement officers as well. What were they really supposed to do? And the problem here is that the critical question was whether their false statements, which were made in the course of carrying out an apparently lawful and authorized investigation, whether those should be considered made with an intent to disobey the law, and alternatively, for purpose of the obstruction counts, because they were also a basis for obstruction, whether they were made with the intent, the corrupt intent to obstruct justice. So what happened here was when the evidence that what they did, which was use deceptive tactics, and they made a technically false statement when they said we're in the process of swearing out an arrest warrant to arrest Agent Mark, is that, should that be, there needed to be evidence that this was part of routine law enforcement behavior, that law enforcement agents are allowed to use deceptive tactics, and in fact, those tactics are... How does that lead, how does that further the investigation? Well, the question is, well, they said, and Maricel Long said in her grand jury testimony, they made that statement because they wanted to talk to Agent Marks, and they were told to make that. In fact, you know, the record shows that the order came directly from Sheriff Baca, who said, do everything but put handcuffs on her. And so they went out, they tried to get her to talk to them. The encounter lasted, I believe, 60 seconds. She said no, and that was that, pretty much. So how do we assess this conduct, right? So what, one of the points we've made in our brief is that they should have been allowed to introduce corroborating evidence that law enforcement agents routinely use deceptive tactics, and in fact, they're allowed to use it, and this is approved, law enforcement agents are allowed to lie. Now, the jury could have found, of course, that, you know, that the lie was made with the willful intent to violate the law, but conversely... And in fact, the jury did find that. Well, they did, but they were not given evidence that corroborated the notion that it was not. The evidence that it would have showed that these activities, because to a layperson, this kind of activity may look wrong, but we tell law enforcement officers that they're allowed to do this. They're allowed to lie to suspects. They're allowed to lie to witnesses. They're allowed to do things that civilians aren't allowed to do. I mean, there usually aren't laws that say you can't lie to people, though, but there are laws that say you can't lie to the FBI. So isn't this a little different than the usual lie? Well, that was the government's argument, but nonetheless, but that makes it all the more important because to be guilty of a false statement, you have to have a specific intent to disobey the law. So if they were acting, and again, we go back to the good faith and the public authority instruction here. If my clients, all of the defendants believed that they were acting within the scope of their authority to obey the law, it's completely inconsistent with an intent to violate the law, and I think that's the fundamental issue in this case. But for my purposes, in terms of, you know, they were entitled to introduce evidence that, in fact, this kind of conduct was routine. Well, but see, I have more trouble in the specifics. I understand the general concept that agents lie, but what was this lie intended to accomplish? It seems far more likely, or I can understand a jury's inference, that it's leading the FBI to knock it off, not that they're really trying to extract information from her. I'm not sure how you could reasonably figure out that she's going to respond in an investigative fashion. Well, the problem is that, well, in this case, what were they hoping to get? They were hoping to get her to talk, and in fact, that's what Sheriff Baca told them to do, go get her to talk, and they obeyed that order, and I mean, I'm not sure, you know, what were they hoping to get? They were hoping to get a reaction. They were hoping to get some information. You know, would it have been better if it had been done another way? Yeah, probably. And what information were they hoping to get that had a legitimate law enforcement purpose? Well, Craig said, Craig told them, he said he wanted to get the names of, he was hoping to identify additional corrupt deputies who were involved in either bringing in drugs or assaulting the jail. They were tasked with trying, the ICID at least, was tasked with investigating their own. So you're saying what they were trying to do is find out from Marks who within the Sheriff's Department was violating the law? That's what they testified to, yes, among other things. So you're not saying they were trying to investigate the FBI now, you're trying to say that they were trying to investigate themselves. That seems like a twist. Well, no, I think he was trying to investigate both, but if you read the grand jury testimony, if you read Maricela Long's testimony, she said we just wanted to get their attention. We wanted to find out what they were doing. Part of what they were doing was investigating corrupt officers. And this is an area where ICID, and I'm running out of time, we want to save some for rebuttal, but ICID has had overlapping jurisdiction. Remember, ICID is tasked with investigating corrupt deputies, offenses by law enforcement agents, not only by the jail deputies but other police departments as well. And consider the circumstances of the interview. It was videotaped, it was audiotaped. There was nothing that would have clued in a reasonable, it was not obvious to a reasonable person, I don't think, to a reasonable law enforcement officer that they were doing something wrong. And that is why the evidence was so critical. I'd like to save the rest of my time, if that's okay. May it please the Court, Tom O'Brien on behalf of Deputy James Sexton. Good morning. I'd like to reserve three minutes, please, Your Honor, for rebuttal. The cornerstone of the case against James Sexton arose clearly from his grand jury testimony, the second time that Deputy Sexton testified before the grand jury. However, that testimony was wrongfully obtained by utilizing the power of the District Court to subpoena a known target before the grand jury. Mr. Sexton had been told, and his attorney had been told, specifically by the U.S. Attorney's Office, he was not a target. And in fact, that objectively was completely wrong. Despite the... Does he believe he had an immunity deal? No, Your Honor, that's not required. However, if the government would call a target before the grand jury, which does certainly happen, it happens when the person is advised that they are a target, and in those particular situations, they're either given immunity to testify, or they're already pled out, there's a cooperation agreement, so they know they're going to be charged, and they're further into cooperation. That didn't happen with Mr. Sexton. Besides the testimony, however, did get read to the jury in the first trial. That jury hung six to six. Following the mistrial, the court did two things, materially changing the case on the second trial. First, the court removed from the jury's consideration numerous instances of the testimony before the grand jury, which indicated that the state of mind of Mr. Sexton, his belief in what he was doing, was based almost entirely on guesswork and rumors. That was removed from the jury. The second thing the court did, it did not allow the second... Why would this guesswork idea have really helped him? Well, because, Your Honor, the whole issue for the movement of the inmate, Anthony Brown, which the court has read through all the records, it was an operation to keep him safe, a theory for the defense, by all the defense witnesses, where they were ordered to move So for his own safety, as has been done hundreds and hundreds and hundreds of times, as we had testimony at the trial, the inmate is removed from the jail computer system and moved to a different location. So if any corrupt deputy who wants to hurt this snitch is looking for him and accesses the system, he will not be able to find him. And that was the testimony. The difference is, if the inmate is being moved around the system in order to obstruct the grand And that's the government's theory, is the obstruction of justice. But I mean, is the idea that he was guessing the FBI was investigating, so he tried to hide him, versus he was sure the FBI was investigating, so he tried to hide him? I'm just not sure why this would be... If you're guessing that that's the purpose. I mean, if it's your purpose to obstruct the FBI, whether you're sure you're doing it or not. I mean, if you know that that's a possibility and you're trying to heed them. Right. In response to that question, Your Honor, I think some of the... We'll call it a confession. That's what the government repeal referred to as, a confession that showed that what he was doing on his testimony before the grand jury was guessing. He said that there were rumors. In response to the court's question directly, why are they moving this inmate around? Well, the order came down, again, to protect him. But down in the jailer level, and that's where Mr. Sexton was, he was there to babysit in his terms. But I mean, they asked him, so you understood you would be breaking some law, is that correct? That's correct. I mean, he was saying in his testimony that he knew that he was breaking the law. And so I guess what you're saying is he was guessing that he was breaking the law and that that's a big difference? No, Your Honor. In response directly to that question, this is it. The fact that they asked him, were you breaking the law? And his answer is, yes, I'm breaking the law. But what the jury didn't hear is through his whole testimony, why did he believe that? There were rumors. We as young deputies were speculating. The jury didn't hear it. They The fact is when Mr. Sexton is testifying, the fact that he was speculating, he was not privileged to the entire information. I was trying to put it together on my own. Right. I just don't understand why it matters. I mean, if he believes that he is obstructing the FBI's investigation, whether he deduced that himself or knew it for sure, I just don't understand this argument, really. Well, because the answer is this, I suppose. There's a complete difference. I'm sure Your Honor would agree if I said somebody told me I was breaking the law and we parsed the first part out and say I was breaking the law. There's a complete difference in that. And the problem with redacting those parts, it's not hearsay, as the government alleges. It's just a state of mind. But by removing all those parts during his whole 45 minute or so testimony before the grand jury, which would let a listener and certainly the first jury listen to this and allow us in closing argument to hit on this repeatedly, I believe there were 14 instances of I guess, I believe, rumor, innuendo, it's all about innuendo and nuance. That covered his whole testimony. And if Your Honor would listen to that type of testimony, as the first jurors did, I'm sure the court could also conclude, you know what? This testimony is really not believable. They're asking questions based on speculation. So we think because of that, that the redactions were certainly harmful to my client. We think there was certain error there. If I go back to the first argument, Your Honor, regarding misleading Mr. Sexton as a target, it's essentially black letter law in the U.S. Attorney's Office that targets are not put before the grand jury. Why? I mean, the cases are clear on that. It's a coercive environment, in particular for a target, as his lawyer waits outside, or in this case, in Alabama, because the lawyer was told, like, your client's not a target, and then to testify. So Mr. Sexton has essentially, as a target, three choices before the grand jury. One, take the fifth, which the government is well aware he wouldn't do. He has been cooperating for months. He's provided hours and hours and hours of testimony to further their... Why didn't he ask for an immunity deal? I believe his counsel certainly should have, Your Honor, but I don't think... I mean, is that the government's fault? No, Your Honor, but I think what the government has a fault in this is if a attorney is told, your client is a target, or he's a subject, we're looking at him, the grand jury is investigating his behavior, and it's crystal clear, this is what the grand jury's investigating, the obstruction. If he's told that honestly, then the attorney would step up and say he's not going to testify. In fact, Mays Jemison, who was the Alabama attorney at the time, a business lawyer, submitted a declaration that's in the record that indicated that he was told by the government correctly that his client was a target. He never would have let him testify. But when you're told affirmatively the other way, he's not a target, then I think it's reasonable for a defense attorney to believe my client has no danger. The U.S. government obviously operates above the law and follows the law, and therefore, I take the government for its word. And so Mr. Sexton then is called before the grand jury. And the reason this case is more egregious, we would offer, than some of the others, including the cases where the courts of appeal actually dismiss an indictment, is number one, unlike those other cases, my client was affirmatively told he is not a target. The other cases, Your Honor, indicate that there was no indication at all whether you are a target or not. So are you basing this on the violation of the U.S. attorney manual, or now are you trying to make a different kind of misconduct argument aside from the manual? I'm always extremely cautious on the word of misconduct. I think what happens here, though, it's a due process violation. And I know the courts are always hesitant to step in in a role to monitor the executive branch. And we're not asking the court to step in and monitor the U.S. attorney's manual, which is, of course, a policy manual which is put out publicly on purpose so everybody knows what the rules are. We've said that's not equal to due process. That's exactly right, Your Honor, and I agree with that. And it's also not enforceable. I mean, it doesn't have the force of law. We've said that, too. I agree with that, too, Your Honor. However, this particular narrow sliver, if the U.S. name is about this big, the narrow sliver that gives this court the supervisory power is the fact that the grand jury does not exist without the district court. The grand jurors aren't called in without the power of the court. We always use the term the U.S. attorney or the arm of the court. The subpoena is issued by the district court. So the court certainly needs to be able to step in and monitor how the U.S. attorney's office is utilizing the power that this court gives it. But if the court yanked the power of the subpoena in the grand jury, there would be no grand jury. So in that particular case, I think the court certainly has the power. The other issue, besides the fact that Mr. Sexton, unlike all the other cases we've been able to find, was affirmatively misled by the government on his status, is the fact that the government in this particular case, unlike the others, put four targets before the grand jury. Three of the other co-defendants testified before the grand jury. So they did this repeatedly. And again, a target does not mean I've got every single shred of evidence. You've confessed. I've got it all. It's on video. We have DNA. That's not a target. The question is, objectively, could he be charged with a crime? Is the grand jury looking at you? And when you're told by the government, no, they're not, come on in, sit down, take the oath, and testify, the government got what they wanted, which is a sworn statement, which was not just used in both trials repeatedly. It was used on the appellate brief filed in response to our brief here. All those statements are from the grand jury testimony. And the reason the court never sees these is because this never happens. This is a violation of the U.S. Attorney's Manual. But that doesn't have the force of law, and he's given his Miranda warning, so it's a little hard for me to see where your hook is that makes this so egregious that we need to exercise supervisory authority. Excuse me. The two areas I think I pointed out, number one, unlike the others, he was affirmatively misled. He's not a target. That is egregious. How is this different from other law enforcement laws used in investigations? Because in those particular cases, Your Honor, the FBI and the police department and the ATF and everyone else certainly has the ability to use bruises and do undercover, but not the U.S. Attorney's Office. Not the attorneys talking to an attorney. That's different. The U.S. Attorney's Office don't lie to other attorneys in order to make a case. They never have, and I'm not saying for a moment that these fine prosecutors did either. What I'm saying is that they were overzealous and utilized the power of the court in order to elicit these statements from my client. And they were incredibly harmful. It was the entire case. So if the court doesn't step in on this case with these facts, then anybody out there that could be a target can be called in front of the grand jury. They'll do what they did here. There won't be any immunity agreements. There won't need to be any. They can say you're not even a target. Come on in. Testify. Oh, you confessed. And by the way, was that a surprise? The answer is no, because in the court record back in August 29th, months before the grand jury, a 302 from the FBI agent, Sexton participated in the sheriff's attempts at hiding inmate Brown from the FBI agents, changed Brown's name, guarded him, OSJ viewed the FBI as an adversary. That makes him a target. There alone makes him a target. At that point, the U.S. Attorney's manual under the power of the court, again, dictates we can't go in there and do anything with that. We have to talk to him with his lawyer and start to work something out. Several times beyond that, November 16th, prior to the grand jury, prior, Sexton heard there was a federal writ issued for Brown. LASD was obtained in a court order. It's a shell game. Multiple times, Your Honor, in the record indicate that the U.S. Attorney was clearly aware. There was no shock that suddenly, out of the blue, Mr. Sexton confessed in front of the grand jury. He'd been saying the same thing over and over again, so that they knew he would incriminate himself before the grand jury because he had done so already. If I can, the last thing I'd like to cover real quickly is the other move by the court, the error that they excluded testimony regarding the government's withdrawal of the writ. In the first trial, we elicited testimony that on August 25th, the writ for Anthony Brown was issued, and then it was withdrawn four days later following a big, a powwow meeting between Sheriff Baca, then U.S. Attorney Andre Barat, and the head of the FBI in Los Angeles, Steve Martinez. Again, it's a turf battle on this phone. We elicited that testimony, and the supervisory special agent, Naro, testified that the writ he was told by the U.S. Attorney had been withdrawn. That was a pretty powerful thing. We made a lot of it during the closing argument in the first trial and said, basically, no one's looking for Anthony Brown. The grand jury doesn't want Anthony Brown. There's no testimony on September 7th that the grand jury's even impaled. This is kind of a four-day, this is nothing. They don't want him. And fortunately, the second time around, the court would not allow us to put that testimony on. The acts of a defendant like Mr. Sexton must have the natural and probable consequence of obstructing the jury. You can't obstruct the grand jury if the grand jury no longer wants Anthony Brown. It makes sense. There was no grand jury on September 7th. And by the way, during this period in August, there's no action that needs to be taken. There's no obstruction until September 7th shows up, and for some reason, the inmate's not there when they're obstructing. The grand jury's not doing anything before that. They're not even impaneled. So I'm going to reserve my time, if I can, unless the court has any questions on me. Good morning, Your Honors. May it please the Court, Ashley Ault for the United States. The Smith case is far less of a labyrinth than defendants have made it appear in their briefs. Defendants intended to obstruct justice, and specifically, they knew of and intended to obstruct a federal grand jury investigation. And as a result, they were rightly convicted. Now, the core premise of defendants' appeal that has been discussed repeatedly today as well is that this result was wrong or unfair because defendants claimed they lacked knowledge that they might be convicted for what they did. That is, that they misunderstood the law, they weren't on notice of the obstruction of justice statute, or most centrally, that they believed that their superior's orders put them beyond the reach of the law. And that's all wrong. A mistake of law is not a defense to obstruction of justice, no matter the source of that mistake. And a quarter of a century of this Court's precedent establishes the relevant standard, which is that all the statute requires is an intent to obstruct justice. It does not require willfulness, much less the kind of willfulness that requires knowledge of a particular code or regulation. It does not require knowledge of an independently determined legal status. It doesn't criminalize violation of some complex regulatory regime. It just requires that defendants intended to obstruct justice, and they did. And is that the case if they also think that they are pursuing lawful orders given by their superiors? Yes, Your Honor. And I think it's helpful in that context to focus on what the actual orders and evidence were here. The orders were to take particular acts to protect Brown, to investigate. And as a matter of common sense and the evidence, it's perfectly possible to take a particular action both to comply with that kind of order and because you intend to obstruct justice. And that's what the record here showed. I actually want to back up and start with one somewhat mundane but important point about preservation of error. In their briefs, defendants have assumed, or in their opening brief they assumed, and in their reply they asserted that they all get the benefit of the objections they made at various stages in trial. And that's not correct. The cases they rely on, two of them relate to evidentiary objections. The only case they rely on for jury instructions, the McKesson case, has been overruled on exactly that point. And the fact of this particular case is wrong. At trial transcripts 615 and 619, the defendants asked for and the court denied both a one-for-all objection rule and a continuing objection rule. And in their jury instruction filing, CR 286, which is the first 90-odd pages of the excerpts of record, defendants submitted overlapping and oftentimes competing versions of instructions. In fact, in some cases, they objected to each other's obstructions. At ER 18 and 19, Craig and Levins objected to an instruction that Smith and Manzo proposed. And at ER 30 and 33, there are different defendant proposed definitions of corruptly. And so on the record here, it cannot be said that defendants had any one-for-all objection with respect to evidence or with respect to jury instruction. I hear you, but particularly with respect to evidence, I mean, there are times when the trial judge may clear his impatience or decline to permit further examination on the notion of, oh, you guys over there have to get this straightened out and we're looking to Mr. X to do the examination here, and I don't want to keep hearing from Y and Z. So at least in terms of trial management, it looks like the district court did treat the defendants at least somewhat collectively. Your Honor, there may be a difference in the context you just stated where you have a particular defendant taking the lead examining a witness than in the context where you have the government examining a witness and defendants raising particular objections to that evidence or the exclusion of particular evidence. And in this case, the court could not have made more clear that at least in that latter case, there was no one-for-all objection rule. So jumping in with all the various instructions, we started with the public authority instruction, and Mr. Ginego stated that a reasonable belief that Superior's orders are lawful defeats mens rea. And again, that's wrong. That's the same vasco continuo that is throughout the brief that mistake of law was somehow exculpatory here, which it's not. This court held in Fulbright that ignorance of the law is not a defense to obstruction of justice. This court's cases in Sieros and Smith-Baltahare, where it goes through the analysis of the kinds of cases where mistake of law is relevant, shows that mistake of law was not relevant here. And more broadly, the particular public... I'm not sure it's mistake of law. I mean, the premise of the argument we're referring to is that the two states of mind are mutually inconsistent. That is, the defendant could not have violated the obstruction of justice statute, could not have corruptly acted to obstruct justice. At the same time, the defendant thought he was pursuing lawful orders from his superior. Are those not mutually exclusive? And if they're not, why not? They are not, and particularly not on the facts of this case. First of all, assuming there were a universe in which defendants were ordered to obstruct justice, and there's no evidence in this record that they were. Well, they're not ordered to obstruct justice. That would be easier. I mean, there's not a Nuremberg rule here. They were ordered to protect Brown and to investigate whatever it was that had triggered this investigation to try to identify allegedly corrupt deputies. And those are things that you would want the Sheriff's Department to do. If the individual defendants thought they were pursuing those instructions, why is their action unlawful or corrupt as an obstruction of justice? There's a difference between whether that was their exclusive motivation, which the facts of this case did not show, and whether they might have had a dual purpose, as has been outlined in the instructions. From an instructional standpoint, the dual purpose instruction was absolutely correct, both as a matter of law under Smith and Lawrence and the First Circuit's analysis in Woodward, and as a matter of facts here, because as the facts show, yes, defendants did take actions that followed orders for them to take those particular actions, but they intended to obstruct justice as well. And I think both as a matter of common sense and as a matter of the evidence that was actually admitted in this case, that's exactly what happened. And the fact that defendant's intent was only partially illegal, only a little bit illegal, is not a defense to 1503 or to anything else. Similarly, on the right to investigate instruction, the California Penal Code instruction, in the reply brief and today, again, they mentioned the court's comments that the game's over after August 18th, when the sheriff found out that it was an FBI phone. It's important to note that that comment was outside the presence of the jury. It is not what the instructions say. The instructions indicated that the defendants did have authority to investigate even potential violations of law. But I think in context, it's also clear that that was a comment on the particular evidence in this case. Defendants had maintained that they might have thought there were some rogue agents that allowed them to investigate FBI agents in this case. But the day they found out that the phone was an FBI phone was the day they found out that it was an authorized investigation, because Sheriff Baca got a phone call from Assistant Director-in-Charge Martinez telling him as much. And so on the particular facts of this case, the claim that there was some rogue agent was totally not credible. And the day they knew it was an FBI phone was the day they knew that it was on a rogue FBI phone in the jail. On Aguilar, just briefly, the government did not shy away from Aguilar at all. And in fact, I think the Sexton target warnings issue shows just how seriously the government took Aguilar in this case. And the jury instructions told the jury that they had to find exactly what they needed to find. The defendants knew there was a grand jury investigation, that they intended to interfere with a grand jury investigation, and that they took steps that were material to that grand jury investigation, which they ultimately did. Turning to the issues that Mr. Burns raised, on juror number five, Sinnington says that if the record discloses any reasonable possibility that a juror was dismissed based on her view on the merits, that she cannot be dismissed. And the record here raises no reasonable possibility that that's why the juror was dismissed. At ER 429, she said her fear had nothing to do with the other jurors. At ER 436 to 37, she again indicated the concerns with her own thought process. And the court's questioning overall was designed to test whether she could deliberate. If she couldn't deliberate, if because of her emotional state she couldn't engage... What do you think she meant by duress? Your Honor, I'm speculating. There are people that have trouble sitting in judgment. It's a common line of questioning during jury selection, and it's not as uncommon as you might think. I think in this particular case, she indicated that she had been honored by the opportunity to sit on the jury, but that as she got further into her own thought process, she wasn't convinced that she could come to the right conclusion. That, to me, based on my personal experience, indicates she may have trouble sitting in judgment of people, or in particular... She was using this word duress, though, which usually sounds more external. So it is very unclear to me what she was suffering from, and it wasn't explored very much, was it? I think it was explored as much as the court reasonably could out of concern for interfering in a deliberative process. As Simington indicates, this is a very sensitive area, and there's a lot to be lost by prying too much into what's going on. But in this particular case, the facts indicated that there was nothing that had to do with other jurors. She kept emphasizing it was her own thought process. The court itself commented that she was extremely upset, and insofar as her answer shifted somewhat over the course of, I think, three or four rounds of questioning, even Smith's counsel recognized at the time that by the time the court had called her back three or four times, she probably felt pressured to start agreeing that she could go back into the room. And then overall, this case is most likely sued. In that case as well, a juror announced herself that she was having, in that case, religious problems with coming to a verdict. There was no complaint from other jurors that the juror was a holdout. There was no indication that it had anything to do with the merits, and the court in that case affirmed that dismissal was appropriate. On Yoshinaga, again, we're back to the central fallacy about mistake of law. But with Yoshinaga, the facts, I think, are the most important, because the only thing Yoshinaga could possibly have established, his memory was so bad, his proffer is nine pages of a lot of nothing, was that he was in the room at various points. Regarding Exhibits 1505 and 1506, the memo that he got... What would the harm have been to the government of admitting Yoshinaga's testimony? Your Honor, I think it was extremely confusing, and I think the proffer itself indicates what defendants wanted to do with this, which was draw out things an uninformed lawyer never said into lengthy testimony about how somehow this gave the aura of legality to what defendants were doing. But Yoshinaga never knew about the writ. Yoshinaga never knew about any of the obstructive intent. You've argued that it doesn't matter if one of their reasons was following lawful orders. I mean, if this would have only gone to that point, then why did it matter if it was admitted? Your Honor, I think it would have been unnecessarily confusing, particularly given Yoshinaga's limited memory and the opportunity to try to draw out a witness that had no foundation also into blessing actions that he knew nothing to do with. That said, at most in some respects, it certainly was cumulative, and we've argued that in the brief, particularly with respect to authority to investigate, since there was a jury instruction that they could investigate. But with respect to 1505 and 1506, which were mentioned today, Yoshinaga couldn't remember anything he said about 1505 and 1506. His proffer is silent on what his leavens who actually did remember something and testified to that. Moreover, 1505 and 1506 are in the record, and so the jury could see that, in fact, Leavens had made the communications that he said that he made. Ms. Landau started her argument about Craig and Long by challenging the sufficiency of evidence regarding their intent, and there is no challenge to the sufficiency of evidence. Long has only challenged the sufficiency of evidence regarding her intent to join the conspiracy, and so I believe those arguments are waived. But getting to the core of what the argument is, the evidence shows that by September 26th, which is the day that Craig and Long approached Special Agent Marks, they both already believed they had no jurisdiction to investigate, because on September 8th, Judge Toribio told them as much when Craig submitted an affidavit to get a search warrant of sorts to get FBI records. Both of them said that they understood that to mean they had no jurisdiction to investigate in this case. Well, they had no jurisdiction to investigate the FBI, but they still had an interest in learning who the corrupt deputies were, because that's their job, internal affairs. Your Honor, the evidence does not show that was the intent for testimony was important. Craig denied that he was lying. Craig said that he was just telling her the truth and that he had probable cause to arrest her and was planning on doing it. Long never claimed to have used any ruse in that discussion. She effectively just said she was trying to pressure them to reveal stuff to her, and her tone of voice on the recording of her interaction with Special Agent Narrow that day speaks volumes. She does not ask Special Agent Narrow, what are you doing? She mocked him and laughed at him when he was scared, and then the recording stopped abruptly. I think the evidence shows that the intent of those interactions was not just to conduct some lawful investigation, particularly when they already knew that they had no jurisdiction to conduct the particular investigation they were doing based on their own understanding of what Judge Toribio did earlier. If the Court has no further questions about the Smith case, I'll move on. Okay. So the Smith case to me demonstrates the breadth of this destructive endeavor, and the Sexton case demonstrates how obviously illegal it was. The target warnings issue that has been raised here has numerous factual and legal defects. Just to focus on a few of them, counsel ignores unrebutted evidence and the Court's finding that Sexton was not a target until his late November grand jury testimony. The only evidence to the contrary is the opinion of his then counsel, not current counsel, who said, I always thought he was a target. And respectfully, that's not credible in light of the record at all. If you look at CR 232, which is the long response to the defendant's original motion to suppress this, it lays out the timeline in detail to how Sexton came on the radar of the U.S. Attorney's Office and the FBI, and that timeline indicates that it's true he was not a target. He was informed he was not a target because he was not a target. He initially reached out to the FBI himself, and keep in mind, he's a law enforcement officer. He's a law enforcement officer from a family of law enforcement officers, and he reached out to the FBI because he had an ax to grind about an unrelated claim of retaliation. But then he said he didn't want to talk because he wanted to only talk off the record. And you'll see there are numerous references to his having his own honor code as to what he's willing to talk about and not willing to talk about. But ultimately, the U.S. Attorney's Office and the FBI hear from another deputy that he may be, in fact, being retaliated against, and he gets subpoenaed in that. And that's what he talks about. And with respect to when he actually became a target, as I mentioned earlier, this really just demonstrates how seriously the government took Aguilar in this case. He became a target when he admitted that he knew of the writ and acted with a corrupt intent to hide grounds that that writ would not be covered. Now, he mentioned the writ one previous time, and he indicated that he thought the Sheriff's Department was engaging in some sort of court order battle to resist it. He did not say he knew he was obstructing justice. He did not say that that court order battle didn't exist and instead they were just going to hide him. And that's what happened during his grand jury testimony later. I've laid out in the brief why legally this isn't a ground for suppression in any case, even assuming he was a target. I would draw the court's attention to the Jenkins case. It's a case from the circuit in which the misled about his target status was not a constitutional violation. And so these cases don't just speak in the context of where there's no information about target status. Jenkins shows that they also apply if someone is misled. So again, he wasn't. Regarding the rule of completeness, the rule of completeness, first of all, does not trump hearsay rule. This court held in the very same case that it also does not apply to testimony that only casts doubt upon the reliability of a particular witness. And in this particular case, Sexton wanted to emphasize things that were already in the record, particularly with respect to the foundation for his knowledge. Not only with those within Exhibit 66 itself, his grand jury testimony, there are numerous references to the sort of guesswork that went into certain of his beliefs. Not as many as there were originally, but many. And looking beyond Exhibit 66, counsel cross-examined both Special Agents Dahl and Mark extensively regarding their failure to ask Sexton where he got things. Failure to confirm that it wasn't just him guessing or passing on rumors. Deputy Bonner testified. Deputy Pearson testified that no one above the rank of deputy ever said anything about Brown being hidden from the FBI. And defendant's closing argument goes on for seven pages on exactly this topic, because there was so much evidence supporting that theory of the defense. And so defendant not only wasn't prejudiced within Exhibit 66, but wasn't prejudiced more broadly. And because of page limitations, we've briefed this at a fairly high level. I would encourage the court to look at the particular excerpts that are required to be admitted. Defendant has claimed that almost every difference between Exhibit 66 in the second trial and Exhibit 48 in the first trial violated the rule of completeness. And some of those examples, it's not clear that they violate any rule on any theory of anything. For instance, Excerpt 10, which was referenced at ER 122 to 23 in the red line, was just a question regarding Exhibit 3, which was admitted at trial, and it was used only to refresh Sexton's recollection about a date, and he said he hadn't seen it before that day. Number 11 is regarding Exhibit 18, which is a September 9, 2011 email chain with Sterling Haley at ER 158 to 59. And all Sexton was asked was for his interpretation of that email. And in response, he goes on a long soliloquy about how the Sheriff's Department is all about innuendo, and they were getting heat from other supervisors. But the only admitted part of Sexton's testimony about that exhibit at trial was his identification of Chris Johnson as Anthony Brown. That's it. And finally, very briefly regarding the withdrawal of the writ, we've laid out, again, the theory that Sexton's actions were not material was covered in depth in both trials. The withdrawal of the writ was a very small, legally flawed version of that evidence. It was properly excluded. Rashid indicates that would not defeat materiality, even if it were true, and it ultimately had no effect on Sexton's ability to argue that his actions were not material in his view. If the court has no further questions, I'll submit. Thank you. Thank you. I don't want you to feel the need to talk so fast that you can't breathe. So assume we will go a little bit over. I really don't think I need much more than a minute. Two things I wanted to point out. First of all, the preservation of error claim. If you look at Brown, that's a case from this court which says that an objection to an instruction applies to all the defendants. So I think that on the instructions, we did preserve it as to all defendants. I think Judge Clifton is right as to the evidentiary rulings. But getting to the core issue here, I really think the government has made it very simple for this court because of the answer they gave to the question, which is that are these two states mutually inconsistent? They think that they're not. They think that you can have both an officer who is told to move Anthony Brown, which is something he does all the time, and that he thinks this is awful because he's getting it from his superiors. He's not in a position to question them. And this seems to be objectively reasonable. They say you can, in that circumstance, both be doing that because you've been ordered to do it and think that it's lawful and be doing it corruptly. And we say you cannot. So if you cannot, is that just a logical problem, though? I mean, I'm not sure. If you're right, I mean, I have trouble getting my mind around any kind of dual intent in any context because it seems like if you have an illegal intent, you have an illegal intent, and if you don't, you don't. But if that tension is there, why does the jury need to be told about that tension? Why isn't it just a logical problem that they can think about on their own and figure out whether they that would negate the corrupt intent is a defense and we're entitled to an instruction on that. So the jury would know that those two things are inconsistent, and we didn't. But is it a legal, I mean, is it a legal point or a logical point? It's both. And I think the case law makes that clear. I think that Barker makes that clear. I think that Smith v. Baltier, Peterson, and all C. Fierro's, they also explain that this negates. And that's what we needed an instruction for. The government says, no, you can have both those. And again, if we didn't get an instruction that we're entitled to, it's not subject to harmless error review. That's on page 45 of our brief, United States versus Zynga. We needed that instruction. We didn't get it. We got something that was affirmatively incorrect. And I think that the issue is squarely in front of the court. Thank you. A couple items on the jury dismissal issue. I think it's telling that Judge Friedland, when you asked, well, what might have been motivating this request to be dismissed? And government counsel says people who have a problem sitting in judgment. This was day five. The juror had never raised that before. That's a complete guess. That's just pulled out of thin air. Now, that this juror was having a conflict with other jurors, that's not pulled out of thin air. That's a natural read of the circumstances. And that's the read that the district court imposed from the beginning of the discussion. Regarding the Oceanaga preclusion issue, it's impossible to say, well, this would have been cumulative, while at the same time, the government capitalized on the preclusion to use the situation as a hammer to make Levins look like a liar. To say, oh, he didn't confer with the Oceanaga. He didn't do that. If the Oceanaga testified, the prosecutor could not have credibly made that argument. So you can't preclude it, say it's cumulative, and then use the situation to crush the defendant. As far as the exhibits, the exhibits said nothing about the interaction between the Oceanaga and Levin. And I will say, of course, the Oceanaga, some of his proffer was, of course, vague. Unfortunately, I think that's consistent with the fear of indictment more than anything else. But there was plenty of meat there. And again, coming back to the fact that if you get it excluded because it's vague or for any other reason, you can't then capitalize on it by trying to present a picture to the jury that you know is untrue. Just a couple of points. First, on record preservation at ER-2, footnote one, the attorneys for Thompson, Craig, and Long joined each objection raised by any other defendant. You know, I think it's important, it's what the government says is true about the law, that if somebody is going to act, if somebody can both be obeying an apparently lawful order and also have the intent to obstruct justice or make a false statement, what we're going to have is we're going to have line deputies, line investigators, they're going to need to seek legal counsel. Do we really, is that what we really want? Do we really want to people who may be a little suspicious or may be a little anxious and say, gee, sorry, sorry, Lieutenant, I'm going to go talk to a lawyer? Because that is what we're, if their view of the law is correct, that is what we are looking at. If there's no further questions, I will submit. The government's response that they were aware that Mr. Sexton was a target when he knew of a writ and acted, I would direct the court's attention to government section record 1803. Again, on November 16th, before the grand jury testimony, Mr. Sexton told the government he had been called to take whatever steps necessary if the FBI or the U.S. attorney came looking for Mr. Brown to take him into custody. So before the grand jury, he's clearly a target. The Jenkins case cited by counsel, in that case, the court took no action because Mr. Jenkins was told he was a subject and could become a target, and that is certainly distinguishable between what happened here. The government says some of Mr. Sexton's guesswork was admitted before the trial, that's great, but we're talking again about his mens rea and by removing those particular portions, there's no valid reason to cut those portions, may I continue? There's no valid reason to cut those portions out except to make that testimony misleading before the jury and make them believe erroneously that Mr. Sexton was talking more from a power of strength. And lastly, the government's position that the writ being withdrawn, the knowledge that kept from the second jury was not material, again, there's no natural and probable consequence of obstructing the grand jury on September 7th if the grand jury isn't even there and no longer requires the body to be brought to them. With that, I'll submit it. Thank you. We thank all counsel for your helpful arguments. The cases are submitted. We're adjourned.
judges: Fernandez, Clifton, Friedland